HUNTER *v.* CARPENTER.

4-8165                                                  202 S. W. 2d 188

Opinion delivered May 5, 1947.

Rehearing denied June 9, 1947.

*Claude B. Crumpler, J. A. O'Connor, Jr.,* and *Robert C. Knox,* for petitioner.

*R. H. Peace,* for respondent.

GRIFFIN SMITH, Chief Justice. Dorothy U. Hunter has asked that we review the Court's action in refusing to award her the custody of an only child, Robert E. Hunter Jr., now six years of age.

The child's father, prior to his marriage to petitioner, and later, was enlisted as a soldier in the regular U. S. Army. Petitioner lived with her parents at Chattanooga, Tenn., until her mother's death in 1933. She continued to reside with her father, Z. R. Umbarger, until 1937. In 1925 Mrs. Hunter became seriously ill. It is contended by respondents that she did not fully recover, and that because of physical and mental handicaps she is not a proper person to care for the child. The Chancellor took this view. We determine whether he was supported by a preponderance of the evidence.

Mrs. Hunter's mother inherited property through a sister. By will the mother devised and bequeathed to the daughter an estate of considerable value, the income from which was approximately $300 per month when the case at bar was tried. However, the property did not vest until the beneficiary became twenty-one years of age in 1934. About four years later she married, but in the meantime had spent an appreciable part of the estate. This was before she learned how to handle money.

According to Robert E. Hunter Sr., he and petitioner corresponded before they met. Hunter was stationed at Marfa, Texas. Petitioner wrote to a "marriage bureau," where she procured Hunter's address. As a consequence she went from Mississippi to Marfa. The wedding occurred in May, 1938. Robert Junior was born September 2, 1940. It appears, however, that discord began before 1940. Mrs. Hunter testified that she became pregnant shortly after her marriage, and in October her condition was such that she thought it best to make arrangements for her confinement. Her husband was drinking, and

had not been at home for two weeks; so Mrs. Hunter went to the home of an aunt in Georgia, remaining about six weeks. She wrote her husband, asking what his intentions were, and saying they should be together on account of the child. In reply a telegram was received in which Hunter admitted having done wrong.[1] There are references by Mrs. Hunter to a visit to Concord, Tenn., for six weeks, and a return to Texas.

Mrs. Hunter remained at Marfa a short time, but left in 1941. Her husband was transferred to Fort Sill, Okla. This occurred a short time after Mrs. Hunter left in January. On the way to Tennessee Mrs. Hunter stopped in Arkansas for a visit with her husband's mother, Mrs. Fannie Carpenter (one of the respondents) and spent six weeks. She was with Mrs. Carpenter again in 1942. In November 1944 she again went to Georgia. At that time she disclosed a highly nervous condition. A year later her father, Z. R. Umbarger, was informed by neighbors that Mrs. Hunter appeared to be mentally affected. Following an examination she was placed in Madison Sanatorium near Nashville, Tenn. The child was left with Mrs. Hunter's father. Robert E. Hunter Sr. was in Germany with the army. He was notified by the Red Cross that petitioner was incapacitated. The suggestion was made that he should arrange for Robert Junior's care. However, the father did not return to the United States until September 1945. After being discharged from the army he reënlisted. This occurred November 17, 1945. At that time he filed with the County Clerk of Union County, Arkansas, an affidavit reciting his marriage to petitioner, birth of the child, a declaration that he and his wife had been divorced; that custody of Robert Junior had originally been left with Mrs. Hunter, but asserting that the mother had voluntarily surrendered custody to him, and that during absence in the army he (the father) desired that the child should remain with its paternal grandmother, Mrs. Carpenter. An allotment of $30 per month was made in favor of the child, and $37 per month for Mrs. Carpenter.

[1] The child referred to by Mrs. Hunter died.

July 27, 1946, Mrs. Hunter petitioned Union Chancery Court for a writ of *habeas corpus*, alleging that Robert Junior was illegally held by Mrs. Carpenter. The father intervened. The case is here on certiorari.

In summing up, Chancellor Speer found that according to the ''great weight of authority'' Robert Junior had not enjoyed the benefits of a permanent home until October, 1945, when he was placed with Mrs. Carpenter. Mrs. Hunter, said the Judge, ''was suffering from psychosis''; and, said he, ''the pitiful thing is that the child has gotten on the nerves of its mother. This is the decided weight of testimony, not only by the doctors, but by laymen.'' It was then found as a matter of fact that it was for the best interest of the mother, as well as of Robert Junior, that Mrs. Hunter be relieved of the care and custody, for ''It is apparent that if the child is placed with its mother the same thing may happen again.''

Was this finding correct?

Respondent Hunter procured the decree of divorce in Union County, Arkansas, alleging three years separation without cohabitation. He subsequently married another. Army base pay is $100 per month, with $15 extra. The government allotment in favor of Mrs. Carpenter and $22 of the allotment for Robert Junior is not deducted from appellee's pay. He proposes to increase the child's allowance to $50 per month. The present Mrs. Hunter is allotted $22 per month, paid by the government, while $34.40 is deducted from the item of $115 to pay premiums on insurance. Policies are payable to Hunter's mother and son.

Although petitioner complains of her husband's treatment before and after she left Texas, a letter written by Hunter February 9, 1941, contains expressions of en-

dearment and solicitude. It is printed in the margin.[2] Another letter was written February 22, and is also copied below.[3]

Hunter testified that when his wife left, it was with the explanation that she was going to Tennessee to look after business matters, saying she was tired of paying ten percent for people to attend to it for her.

Because while on guard duty he failed to report, or, as it was expressed, "for omitting to call in every hour," Hunter was court-martialed while at Marfa. He did not know when the first allotment was made in favor of wife or child; but, after being transferred to California, he directed payment of $10 per month. Later he was advanced in rank and increased the amount to $40.

Mrs. Hunter, in testifying, said that she was thirty-three years of age and lived at Lakeview, Georgia. She owns a house in Chattanooga and another in Knoxville, purchased with money that came through her mother. The inheritance included oil interests.

Mrs. Carpenter and the child's father "came over to my house to 'take out' *habeas corpus* proceedings. I was not physically able to go through with the suit; had low

[2] "Dear Dorothy: Hope you and Junior are O.K. I sent your trunk to El Dorado, general delivery. I don't know lots and street address. Honey, they sent your mail to a fellow named Hunter in D. Battery and he said it was opened by mistake. You had a check and letter, and I am enclosing them. Dear, I sure have been missing you and Junior. I'll sure be glad when we get to Ft. Sill. Sweetheart, I'll have to quit and mail this. Kiss Junior for me and write real soon. Tell Lois and all the folks hello for me and for them to write me. All my love to you and Junior. Robert."

[3] "Dear Dorothy and Junior: Hope you are feeling fine. I received your letter a few days ago. I kept putting off writing because we've been expecting the order to go to Ft. Sill any day. The order came in yesterday and we are going to leave next Thursday. . . . Don't know if we will get paid before we leave, or not. I will try to find an apartment soon as we get there and come after you and Junior some time next month. I'll come just as soon as I can get a pass. We'll be pretty busy for a while after we get there because we will have to organize a new outfit. Yes, Honey, I met Wheeler's wife the other night. She seems to be a nice woman. I haven't been able to sell the baby bed yet, but am going to town Monday morning and try to sell it to some one. Nobody wants one, and it is awfully hard to sell it. Will write you on my arrival at Fort Sill. Kiss Junior for me. Love, Robert."

blood pressure and had just had a blood transfusion. Was trying to rest and regain my strength; so I agreed that Junior's father and grandmother could take him home with them for a while. I did not agree to let them have the child permanently. When I recovered my health I came out here to get my child, but Mrs. Carpenter refused to let me have him, so I thereupon filed this suit.''

While in the Sanatorium Mrs. Hunter left Junior with her father. Upon leaving she took the boy home with her. After a while petitioner placed the boy with a Mrs. Berkhart, and then with a Mrs. West.

Mrs. Carpenter testified that after Mrs. Hunter left the Sanatorium she (Mrs. Carpenter) spent a short time with the child's mother. Together they went to the Berkhart home, where Mrs. Hunter was paying $7.50 per week for the child's keep. This trip was made in June 1945. The witness says she told Mrs. Hunter the Berkhart place was unsuited to the boy's needs because of a lack of cleanliness. There was this testimony by Mrs. Carpenter: ''When we left [Dorothy's] home I thought we were going to town, but we wound around and finally got to Mrs. Berkhart's. It was 'kinder' a back alley way and [Dorothy] seemed to be lost. . . . It was a four-room house with a screened porch—a nasty place. It looked like a Negro settlement. [Junior's] bed was dirty. When we got back home I said, 'Dorothy, don't keep that child in that nasty place. . . . If you can't keep him I can take him back home with me.' Dorothy said the place had been recommended to her.''

With reference to the West home Mrs. Carpenter testified that she went there to get the child, but was not allowed to see him. Mrs. West would not let her in. The [yard] was ''all grown up in weeds. It was not a place for a child. The little ones there were 'tough.' Junior's father was with me, and he said, 'It is a pretty come-off not to let the child's father and grandmother see it.' Mrs. West replied, 'I can use a gun.' She said she had been in one kidnapping.'' When asked specifically what she

knew about Mrs. West, Mrs. Carpenter replied, ''Nothing, except that she was a mighty rough customer.''

Apparently Mrs. Carpenter then went to Mrs. Hunter, who called her father, Z. R. Umbarger, and told him to get the child:—''I asked if it would be all right for us to get [Junior] and [Dorothy] said 'Yes, it will be all right for [the father] to have the child part of the time.' [Junior's father] then said she (Dorothy) could come to see the boy at any time. I then brought Junior home with me. We live in a long building divided into three rooms and a bath.'' When asked if it was a comfortable home Mrs. Carpenter replied, ''Yes. There are nicer homes, but we live there. My son Frank lives with us.''

Testimony regarding petitioner's mental condition is in sharp conflict. Dr. Jesse Hill, psychiatrist at Eastern State Hospital [for the insane] at Knoxville, examined Mrs. Hunter at his office February 17, 1945. She gave her address as Rossville, Ga.:—''I found that she had a psychosis. The type was undetermined, but it was of a depressing nature. She had many delusions, such as . . . an impulse to put poison in the food of others; said she had nothing to live for; also had 'spells' when she did not know what she was doing. I sent her home and advised that she be put in a mental institution.'' The witness would not say whether at the present time (September, 1946) Mrs. Hunter was competent to have custody of the child: this because his examination was in February, 1945, and he had not seen her since.

Dr. Hill's testimony was concurred in by Dr. F. O. Pearson, who examined Mrs. Hunter in February 1945. Dr. Hill thought she was suffering ''from a definite psychosis and was mentally unfit to properly rear her child.''

Another witness (Mrs. Ruby Drummonds) testified that when the boy was very small Mrs. Hunter would not take care of him:—''She would play with him until he began crying, then she would leave him. Later she came back and was worse than before. Instead of using a switch she would get a stick of stovewood. She told peo-

ple she had to do this or she would have to put him in an orphans' home." On cross-examination the witness (who was a daughter of Mrs. Carpenter and appellant's sister-in-law) was asked if she had ever seen Mrs. Hunter whip the boy with a stick of stovewood. She replied, "Yes, but my mother got the baby and went into the house with him."

Against the medical testimony offered by the petitioner and intervener were statements by El Dorado doctors, and by non-professional witnesses, who thought that Mrs. Hunter was fully competent to care for the child. Some of the lay-witnesses were non-residents who had known Mrs. Hunter for a long time and who had not observed any abnormal conditions. The El Dorado physicians expressed opinions that if Mrs. Hunter had at one time suffered from any cause there had been complete recovery.

Perhaps the most striking testimony came from Mrs. Hunter's father. Umbarger, a citizen of Whitehall, Tenn., who had formerly lived at Chattanooga, detailed at some length the circumstances attending Mrs. Hunter's conduct and her mental and physical status. Her attitude toward her father and brother, he said, had always been peculiar, and "we never knew where we stood with her." Her unusual conduct began shortly after 1925 when an attack of scarlet fever left certain adverse results. In 1945 Mrs. Hunter seemed to have undergone a complete physical breakdown. Neighbors called and suggested that she might be deranged. "I made investigations," Umbarger said, "and Dorothy seemed to realize there was something wrong with her mentally and insisted that she be taken to an institution—this at her own request. She was to have stayed there three months, but at the end of half that time she caused such trouble to get out, and the doctor wrote me about her condition in every way, stating that her case, as he called it, was not a complete mental case, but an extreme case of nerves.

"She claimed her boy when she got out, and I knew it would cause the same old trouble. She went home after

she got the child and went to Mrs. West's place. It seems she and the boy got on each other's nerves. She had no control over him. The child, being in her custody and care, made her condition worse; and it was not right for the child. She explained that her memory was bad; that she would get on a street car and not know where she was going. [She also explained] that once she used washing powder instead of flour in making bread. We were afraid that if there should be any poison around she might endanger her life and that of the child. Her nervous condition has not been so bad since she was relieved of the child. I have seen her very little, but her friends have remarked on her improvement. She seems to pride [herself] on doing just what she pleases, without any interference. You can never tell how she will react to any proposition. . . . . I am acquainted with Mrs. Carpenter. I think she is a proper person to have the care and custody of this child and I think the child is very fortunate to have a grandmother to give him a home. I know very little about the child's father, but I believe he is devoted to the little boy, and as far as I know he is the proper person to have the care and custody. I do not think my daughter should have the custody, [and] I hate so bad to say it! I go to church and Sunday School. I am affiliated with the Presbyterian Church of Chattanooga, and have been since 1916. I am not addicted to strong drink.''

In testifying further, Umbarger said he knew very little about the marital relationship of his daughter and her husband, but ''When she came to my home she did not say anything about her husband having left her. Dorothy has an independent income—enough to maintain a good living standard. I know [this] from the fact that her mother left her money, and her brother has increased his holdings.[4] I know that she prides herself on the fact that no one knows how much money [she has], 'and noth-

---

[4] In appellant's abstract this sentence reads, ". . . and her brother has increased *her* holdings." The inference would be that Mrs. Hunter's brother handled her estate. However, the transcript shows that "*his*" was used, indicating that each inherited from the mother.

ing about her.' She has no feeling for us, and as far as I am concerned she can handle her own affairs." Question: "You don't care much about what your daughter does, do you, Mr. Umbarger?" Answer: "No, I don't. She does not want anyone to know anything about her business, and the best I can do is to respect her wishes."

Later Mr. Umbarger testified that he saw Mrs. Hunter "five or six months ago about a business proposition. She seemed able to transact business at that time, and I settled the business with her. The administration of Dorothy's property has never been taken away from her."

March 13, 1945, Mrs. Hunter wrote to her son from Madison Sanitorium, addressing him as "Dearest Bobbie," and closing with the expression, "Write Mother, and be good. With love, Mother." This letter is printed in full in the margin.[5]

---

[5] "I want to thank you for the good old box of cookies you sent me. One of the nurses comes in my room and eats some of them with me. She likes your cookies too.

"Sonny boy, I went to Vanderbilt yesterday for a fluoroscope, I believe it is called, and the Dr. told me this morning that it showed up many things wrong with me, that I had a form of epilepsy. I had known it a long time, but knowing there was no insanity in our family I hated to ever give in to it, but had gone so long that I got in condition I had to, but your crying caused me some kind of spells I never had before, but I had everything so hard on top of being up so much every night with you, but am satisfied that with other troubles I had had when single and still have that there were other causes too, sonny.

"How you did cry when you were a little baby, and on up till after three years old. My condition since you were born has given me much concern. I realized that you needed mother to live to raise you, but couldn't see my way clear to holding out, so I could live to raise you, I wonder just how much longer I can live. You need me very much, but as I think of how hard you made yourself on me all the time I kept you when you could have been good to mother and played out in the yard, and entertained yourself instead of staying inside right at my feet all the time, dictating to me the whole time and fussing and finding fault with me, and I see how much better you do for other people than you ever did for me, I feel like it will be better for me not to even be worrying about living to raise you, since you seem to make more out of yourself without me, that it wasn't intended for me to live to raise you, but if you had made things easier on me I believe I could have held out, and never would have landed here. I'm going to have to look out for myself from now on and make other arrangements for your care when I come home. I had in mind a home like Aunt Susie worked in where you would have children to

It is suggested that the Chancellor, in weighing the evidence, did not give appropriate consideration to the probability of improvement during the lapse of time between examination and observation of Mrs. Hunter by physicians called by Mrs. Carpenter and the child's father; that Mrs. Hunter's testimony, given orally in open court, discloses a rational mind and logical conclusions; that Umbarger's attitude was not that of a natural father; that he had been disappointed because the daughter insisted upon handling her estate, to his exclusion, and that selfishness colored the testimony to such an extent as to render it of little probative value.

All of this *may* be true. It must be conceded that credible witnesses—both physicians and laymen—gave direct testimony tending to support Mrs. Hunter's contention that whatever disability may have impaired her capacity to care for the child in 1945 had been removed, and that her condition at the time the hearing was had was that of a sound and normal person. But to accept this analysis of the evidence we must believe (as the Chancellor seemingly did not) that Mrs. Hunter fully recovered after 1945, and that her father was mistaken and highly prejudiced. If Mrs. Hunter's father's conduct was singular, hers also was unusual. In her letter to the son who was at that time but four and a half years old, the entire tone is one of self-pity, and throughout the communication there is accusation. "I think," said she, "how hard you made yourself on me all the time I kept you, when you could have been good to Mother and played out in the yard and entertained yourself instead of staying inside right at my feet all the time, dictating to me the whole time, and fussing and finding fault with me."

---

play with all the time and I can come by and get you and bring home on week ends. Maybe there is a place in Chattanooga for you.

"I regret very much my inability to raise you honey, but I did the best I could, under the circumstances. I'm making you a quilt for your little bed.

"I miss you so much. I wish you were close, where I could see you often. Bless your little heart, sonny, I've only made you a piece of a mother, but would have done better if I could have."

It seems preposterous that a normal mother would believe that a child less than five years of age would be "dictating" to her. And again:—"Since you seem to make more out of yourself without me, . . . it wasn't intended for me to live to raise you; but if you had made things easier on me I believe I could have held out, and never would have landed here. I'm going to have to look out for myself from now on and make other arrangements for your care when I come home."

The doctors at Vanderbilt had told Mrs. Hunter, according to her letter to the boy, that many things were wrong with her, and "I had known this for a long time, but knowing there was no insanity in our family I hated to ever give in to it, but had gone so long that I got in condition I had to; but your crying caused me some kind of spells I never had before."

The evidence indicates that under Mrs. Hunter's mother's will Umbarger had the discretion to turn the estate over to Mrs. Hunter when she attained the age of twenty-one years, or he could continue to administer it.[6] The clear inference is that Umbarger chose to relieve himself of the responsibility involved in handling the estate; hence he did not, as might be inferred in respect of one interested in self-profit, attempt to retain the money. Yet, another construction might be that the father was indifferent to his daughter's welfare and availed himself of the first opportunity to wash his hands of the transaction.

We think the Chancellor, who had many of the witnesses before him, (as was the case in *Tilley* v. *Tilley*, 210 Ark. 850, 198 S. W. 2d 168), was in better position to judge the motives pertaining to the controversy than are we. The decision now reached is by a divided

---

[6] As reflected by the transcript, p. 109, Mrs. Hunter was asked by one of her attorneys: "I believe your mother stated in her will that the property was to be turned over to you at twenty-one, unless your father saw fit to do otherwise?" Answer: "He did turn it over to me, and I spent a good deal of it before I found out how to make the proper investments." Question: "He had turned the money over to you, and he had to make a settlement, and you have handled it since?" Answer: "Yes."

Court. Three of the Judges entertain views sharply opposed to those of the majority; and, if the trial Court had found that the child's best interests would be served by taking custody from Mrs. Carpenter and again investing Mrs. Hunter with a mother's responsibilities, perhaps all of us would agree. But to reach that conclusion we would be required to say that after patiently listening to all that was said; after observing the witnesses, and considering testimony given in Mrs. Hunter's behalf by physicians living in El Dorado, and after a judicial admeasurement of depositions and a balancing of sentimental ties and the boy's welfare—to reach a conclusion favorable to Mrs. Hunter we would be forced to say that the Chancellor was wrong in his appraisement, and that we, with only the printed record before us, are better prepared to evaluate the facts and to turn the scale to another balance. This the majority cannot do.

The order will be affirmed without prejudice to Mrs. Hunter's right later, by appropriate procedure, to establish her right to share in custody of the child if changed conditions are to her advantage. Affirmed.

SMITH, J. (dissenting). This is not in fact a lawsuit between the father and mother of their child over its custody. In litigation of that character neither parent is preferred over the other, but as has been said in many cases, the welfare of the child in those cases is the chief and controlling consideration. On the contrary, as will presently very conclusively appear, the litigation is between Mrs. Carpenter, the father's mother, and the mother of the child, and in litigation of that character there is a preference in law. The parent who wishes to keep the custody of his or her child has the right to do so, unless for good reasons, and for the child's protection and benefit it should be given to a grandparent or to some other person.

Here the parents of the child were married May 13, 1938. At that time the father was a soldier in the regular army, and after his marriage, he was sent over-

seas. Upon his return and discharge, he re-enlisted after the conclusion of hostilities and is in that service now.

On January 24, 1944, he obtained a divorce from his wife on the ground of no cohabitation for a period of more than three years. The divorce was obtained upon publication of a warning order, and Mrs. Hunter testified that she was unaware of the pendency of the suit until after the divorce decree had been rendered, and her husband had remarried. This was his third marriage. She testified that her husband knew her address, but that she received no notice of the suit, and that she only learned of the divorce through the War Department.

According to the undisputed evidence, Mr. Hunter, the father, has never at any time had the care and responsibility of the child for a single moment, and he does not claim ever to have spent one dime of his own money in its support as the government allotments for the child were supplementary to his base pay. He now has a wife and presumably a home, but he did not ask for the custody of the child when he obtained his divorce, and he does not now ask that he be allowed to take the child into his own home.

Mr. Hunter, the husband, was stationed at Marfa, Texas, and his wife lived there with him for a short time before he was transferred to Ft. Sill, Oklahoma. He testified that he told his wife that he was going to be transferred, and that he directed her to go to his mother's home, but she said she would go to her own home, although before doing so she made a visit of some six weeks to two months at her mother-in-law's home. She testified that when she left her husband did not give her the money to pay her bus fare.

After leaving Marfa, Mr. Hunter wrote a letter dated February 22, 1941, in which he stated he was expecting to be transferred to Ft. Sill at any time, and that he would send for her after his transfer, when he had found a home, but he never sent for her. On the contrary, Mrs. Hunter testified that although she wrote Mr. Hunter

a number of times to send for her, advising him that she was ready to go when he said come, she never received that invitation. He did write several letters indicating an intention to send for her, but he never did fix a time for her to come.

When Mrs. Hunter left Marfa she was unable to take her baby bed with her, and in the letter above referred to, Mr. Hunter wrote appellant that he had not been able to sell the baby bed, but that he expected to do so. Evidently he did not contemplate that he would have any further use for it.

Mrs. Hunter lived for a few months in the home of her father, but conditions were not congenial there. She had inherited some property from her mother, which, as required by her mother's will, was turned over to her by her father. This property was not well invested and much of it was lost. Mrs. Hunter took her child and placed it in the hands of a Mrs. Burkhart. She and Mrs. Carpenter, her mother-in-law, visited the child at Mrs. Burkhart's home, and both concluded that this was not a suitable place for the child, and she took it from Mrs. Burkhart's home and placed it in the home of a Mrs. West. Mrs. Carpenter testified that this was not a suitable place for the child, although she had never been in it. She testified that she went there but was refused admission by Mrs. West. Further reference will be made to this home and its character.

There is no question but that Mrs. Hunter developed a serious nervous condition, of which she was fully aware, and she went to a Sanitorium for treatment. While there she wrote the letter copied in the majority opinion, which appears to have largely controlled the decision of this case. This letter was written in a good firm hand, as appears from the photostatic copy thereof appearing in the record. It was well composed, properly punctuated, and does not contain a single misspelled word, although it is three pages in length. In referring to her illness she used in this letter the word "epilepsy," which is correctly spelled, rather than the word "psychosis," which

she may not have been able to spell. But neither word would have conveyed any meaning to the child except to advise him that the writer, his mother, was not then in physical condition to have him with her. The word "psychosis" appears frequently in this record, and was employed by all the doctors who testified in the case, and no one of them used the word "epilepsy," or indicated that she had that affliction, but all employed the word "psychosis" in one connection or the other.

The testimony of Mrs. Hunter's father appears to have been given great weight by the majority, and so it should have been, if it were only true. With apparent candor, but I think only to give it greater weight, he testified that he regretted to say that he did not think his daughter should have the custody of the child. It is suggested that Mrs. Hunter labored under hallucinations, one of these being that her father was not friendly to her. I think the testimony shows that was no hallucination, but is a fact. Mrs. Hunter did not denounce her father, or speak unkindly of him, but the testimony develops certain facts which dissolve the hallucination theory. Mrs. Hunter's mother left her some or all of her estate. The record does not show what part or the value thereof. But whatever its value may have been, the father surrendered it to her as he was required to do under the will of his wife. Later, and after Mrs. Hunter left the Sanitorium where she wrote the letter to her son, above referred to, she inherited property from which she derives an income of $300 per month. This inheritance came from a relative of her mother. She did not permit her father to have control of this property.

Her father testified that his daughter appeared to be normal until about 1945, when she contracted scarlet fever, and was given a treatment which affected her physically almost immediately, and that she had never been the same since, and at her own request he took her to the Sanitorium. While she was there the doctor in charge wrote him that his daughter "was not a mental case but an extreme case of nerves." After leaving the

Sanitorium Mrs. Hunter took her child and placed him with Mrs. West. Mrs. Hunter's father and Mr. Hunter went to Mrs. West's home to see the child, without advising Mrs. Hunter that they were going to do so. He stated that it was only about 7:20 in the evening, when he went there. Mrs. West placed the time much later. At any rate the child had retired and was asleep. Mrs. West denied him admission for the reason stated by her that she had been in one kidnapping case. Mrs. West had served as a missionary to China for some years.

Mrs. Hunter's father admitted that after Mr. Hunter was again inducted into the army the child lived with its mother except for short intervals, and the time and number of these intervals will be detailed. He tried to discredit Mrs. West's home by saying that soldiers went there, but he admitted that all he knew was mere rumor, and it was shown that the soldiers who did go there were the husbands of two women who were boarding with Mrs. West. He stated that the child was fortunate to have a grandmother who would give him a home, although he knew that his daughter was making every effort to get this child into a home which she owned.

Mrs. Hunter's mother died in 1933, and her father remarried in 1937. He stated that when Mrs. Hunter married it was published in the newspaper that he had announced the marriage, when he had not done so. Mrs. Hunter admitted that her father had not authorized the announcement, but she thought this the best way to make the announcement. He stated that Mrs. Hunter took pride in the fact that no one knew how much money she had, which she had inherited from her uncle, and stated that "So far as I am concerned she can handle her own affairs." He was asked: "You don't care much about what your daughter does do you?", and he answered, "No, I don't. She does not want anyone to know anything about her business, and the best I can do is to respect her wishes."

Other testimony of the father shows, I think, the deepest animosity and not a mere hallucination.

But the crowning piece of animosity, not to say mendacity, was the production of the letter from Mrs. Hunter to her son, written at a time when she was distracted over her financial inability to provide her son as she wished to do, the lack of sympathy of her father, and her then debilitated physical condition. Her father went voluntarily to El Dorado, where his depositions were taken." Counsel for appellees say, "He was caught up by appellees and his deposition taken."

The present wife of Mrs. Hunter's father gave the hearsay testimony that Dr. Pearson and another doctor had told her that it was not advisable for Mrs. Hunter to keep the child with her and Mrs. Drummond, a daughter of Mrs. Carpenter, testified that Mrs. Hunter used a stick of wood in correcting the child.

I should not dissent in this case if the testimony showed the state of Mrs. Hunter's health to have been unchanged since the date of her letter to her son. But it shows a change.

Two doctors testified as medical experts on behalf of appellees. One of these, a Dr. Hill, testified that he could not say whether Mrs. Hunter is now a competent and fit person to have the custody and responsibility of rearing her child, as he had not seen her since February, 1945. He did say that if her condition is the same now as it was then, she would not be a fit person to have the custody of the child. He testified that when he examined Mrs. Hunter in February, 1945, she had a psychosis type undetermined, but of a depressed nature and that it was on his advice that Mrs. Hunter was sent to the Sanitorium.

Testimony somewhat stronger was given by Dr. Pearson, a physician employed in a mental institution in Tennessee. He testified that he examined Mrs. Hunter on February 12, 1945, and had seen her twice since, and he thought her mentally unfit to rear a child, and that he saw no reason why her mental condition could be improved.

Opposed to this testimony was that of three other physicians. One of these, Dr. Fincher of El Dorado, who had done post-graduate work in a number of leading colleges and schools, testified that he had just completed an examination of Mrs. Hunter, and except for being a bit anemic, he found her in good physical condition, with no evidence of any organic disease. When shown the answer of Dr. Pearson taken on interrogatories, that Mrs. Hunter was suffering from a definite psychosis and was not then mentally fit to properly raise a child, he was asked what he would say of Mrs. Hunter's present condition, and he answered: "I am satisfied that she is fully recovered at this time and does not have any psychosis now." A Dr. Horton residing in Chattanooga, Tennessee, near which city Mrs. Hunter now resides, testified that he was a graduate of Yale Medical School and the University of Edinborough, and that he had actively engaged in the practice of his profession for thirty-five years. He testified that he had known Mrs. Hunter for six or eight months and that during that time examined her on different occasions at intervals of two or three weeks, and that at no time did he find any evidence of her being mentally incompetent or of unsound mind. That she seemed to be in good health physically and mentally, and that he found nothing to give her treatment for, and that his last examination was the same as the first, and that basing his opinion on his acquaintance with her and his examination of her, he was convinced that she was competent and a fit person to have and discharge a mother's responsibilities in rearing a child. He further testified that Mrs. Hunter appeared to be very intelligent, and he saw no evidence of nervousness whatever, and that he found her to be a fine, high type woman.

Dr. Wharton of El Dorado gave testimony equally as convincing. He had examined Mrs. Hunter for forty-five or fifty minutes the day before he testified. He stated that her memory was adequate and that there was then no evidence of psychosis and nothing to suggest neurosis. That Mrs. Hunter reads well, has had eleven

years of public school work, and two years of vocational school; that she has transacted her business satisfactorily, and gave no impression of illness, and that he found no evidence whatever of true psychosis, and that she remembered too much about her condition to be insane or to have been insane at any time. That if she had psychosis in 1945, due to her nervous condition, the trouble had entirely cleared up, and that while that condition might return, it might as likely occur in anyone else who had never had it. This is the woman who largely through the testimony of her father, has had her child taken away from her yet she indulged in no criticism of her father except to say that he wanted control of her property.

Sufficient to provoke a frenzy on the part of Mrs. Hunter, were questions of the most brutal nature, one of these being, if she had attempted to have sexual intercourse with her son when he was five years old, and while she answered the question with the scorn it deserved, she preserved her equilibrium.

Three ladies, friends and neighbors of Mrs. Hunter, accompanied her to the trial to give evidence in her behalf. A Mrs. Williams who is the secretary to one of the leading law firms of Chattanooga, testified that she had known Mrs. Hunter for twenty-two years and had lived within a few doors of her for several years. She recalled Mrs. Hunter's illness, but stated that the trouble had cleared up, that Mrs. Hunter was a christian lady and that her reputation was good, and that she attended church and Sunday school, and carried her son with her.

Another witness, named Mrs. Williams, but not related to the other, testified that she had lived across the street from Mrs. Hunter in the town of Rossville, Georgia, near the city of Chattanooga, and that she saw Mrs. Hunter nearly every day. That Mrs. Hunter was deeply interested in her child, and made him mind as well as any child does. That Mrs. Hunter played the organ at a mission church which they both attended, and that her reputation was not only good, but was very good. She

recalled Mrs. Hunter's illness and her stay in the Sanitorium, and stated that after conferring with an outstanding judge in Chattanooga, she advised placing the child with Mrs. West. At Mrs. Carpenter's suggestion she had told Mrs. Hunter that Mrs. Burkhart's home was not a good place for the child, and Mrs. Hunter removed him. She further testified that Mrs. Hunter had been a mental case, "But she is all right now. I am with her every day and if there is anything wrong with her I have not seen it."

Another neighbor had known Mrs. Hunter for nine years but did not see her during the period of her illness, but had seen her frequently during the past six months and stated, "I certainly think she is physically and mentally capable of rearing her own child."

The opinion of the Chancellor delivered in this case reflects that the decree was based upon what I think was a misapprehension of the testimony, and the majority have fallen into the same error. In this opinion it is stated, first, that this was a suit between the father and the mother of the child. Second, that the mother was suffering from psychosis. Third, that if the child was returned to the mother "the primary condition might return." And finally, "The child has not had a permanent home and did not have one until October, 1945, was just shifted about." And upon these findings it was adjudged that it was best for mother and child to leave the custody of the child undisturbed.

When the testimony has been correctly analyzed, I think the findings stated are contrary to the preponderance of the evidence.

First, this is in fact a suit between the mother and the grandmother, originating when the mother brought *habeas corpus* to recover possession of her child. It is true that after the suit was filed the father was made a party, upon a motion of his mother, and with more loyalty to his mother than Mrs. Hunter's father has shown to her, he joined in the defense of the suit. But in this connection there are certain facts which should not be

ignored or left out of account. The father married after being divorced, and had made no attempt to take the child into his home, and he does not now ask its custody for himself, but only for his mother. After re-enlisting in the army he prepared a statement to the effect that the custody of the child had been voluntarily given him by its mother, and that his own mother now had the permanent custody of the child, and he directed that allotments be made his mother on that account, these amounted to $30 per month for the support of the child, and $37 per month for its care. So that Mrs. Carpenter will receive not from the father, but from the government, the sum of $67 per month, so long as she retains the custody of the child. She is now living in a cottage with three rooms, and a bath, paying $10 per month rent, with another grown son and the child. The affirmance of this decree will not give the custody of the child to the father. He does not even ask it.

Many cases have announced the law applicable to this situation. A quite recent one being the case of *Hazelip* v. *Taylor*, 209 Ark. 510, 190 S. W. 2d 982, which was a contest over the custody of a child between the father and the child's foster parents. In reversing the judgment which had awarded the custody of the child to the foster parents we there said: "So, in the instant case, Taylor will not be deprived of his legal and natural rights unless it be convincingly shown (a) that as a father he has forfeited his claim or that circumstances make it impossible for him to fulfill the parental obligation, and (b) that the child's welfare requires alienation."

There is no real testimony that Mrs. Hunter ever abandoned the child, the only testimony to that effect being that of Mr. Hunter that Mrs. Hunter had voluntarily given him the permanent custody of the child. This testimony is contradicted by Mrs. Carpenter whose testimony was that Mrs. Hunter agreed that Mr. Hunter might have the child a part of the time and that testimony corroborates the testimony of Mrs. Hunter on that question. She stated she thought a temporary change might be beneficial both to her and to her son. If the

removal of the child from the state of Georgia to this state was not intended by the mother to be a transfer of custody but was only a temporary arrangement, the child continued in the constructive custody of its mother.

In a controversy of this character the law shows no preference to one parent over another, but considers primarily the welfare of the child. But this is not the rule in a controversy between a parent and one otherwise claiming the custody of the child. In holding that the right of the parent is preferred, it is said in the case of *Lipsey* v. *Battle,* 80 Ark. 287, 97 S. W. 49, that: ''This right is founded on the fact that the natural love and affection of a mother for such a child would probably be greater than that of anyone else, and that the best interest of the child will generally be subserved by allowing it to remain in her custody.''

Now the finding that Mrs. Hunter was suffering from psychosis might be true if it had read that she had suffered from that ailment, although it appears from what has been said, this may not be true. That Mrs. Hunter was severely ill at the time she wrote the ill fated letter to her child is not denied, although there is a doubt as to the nature of her ailment. No one of the doctors stated that she was thus afflicted at the time of the trial, and three doctors expressed a definite opinion to the contrary. There is at least some doubt on the subject, and that doubt should have been resolved in Mrs. Hunter's favor and not against her. This is true for two reasons, the first being that she was the natural custodian of the child, her husband not asserting that right in himself.

But there is a second reason equally as potent. It is this. Decrees awarding custody of children are final unless and until it be shown that a change has occurred in conditions which induced the award of custody. If Mrs. Hunter's illness, whatever it may have been, should return, although it was the opinion of three doctors that this was improbable, it would then be in the power of the court to change the custody of the child and place it in

the care of someone who would give it the attention and protection which its infancy required. On the other hand, if this decree is not reversed, Mrs. Hunter has permanently lost the custody of her child and her heroic efforts to regain her health and recover custody of the child will be at an end, for the reason that in any future suit she would be confronted with the fact that she was once psychopathic, and that that condition might return.

But the law is that a part illness, no matter how severe, or long continued, will not, after complete recovery, deny a mother the right to have her child with her. *Loewe v. Shook,* 171 Ark. 475, 284 S. W. 726; *Herbert v. Herbert,* 176 Ark. 858, 4 S. W. 2d 513; *Holmes v. Coleman,* 195 Ark. 196, 111 S. W. 2d 474.

In the case last cited the facts were that the mother was suffering from nephritis when her child was born and it was decided that the mother should be placed in a hospital for treatment, and that the care of the baby should be intrusted to a neighbor, who after keeping the baby for three years asked to be allowed to adopt it, which request was denied. The mother was so appreciative of the service rendered to the child, that she refrained from taking it into her custody, although she had asked for its return, until the child was seven years old, when she brought *habeas corpus* as Mrs. Hunter had done. It was there held, to quote a headnote: "Where the mother, sick at the time the child was born, was unable to care for it, and appellants graciously took it and cared for it while the mother was in the hospital; where there was no abandonment of the child nor a gift of it; and there was no question about the parents being proper parties to care for the child, an award of the child to its natural parents was proper."

No doctor who had recently examined Mrs. Hunter testified that the child would, if returned to its mother, again get on her nerves, and the great preponderance of the lay testimony is to the contrary. The unnatural father gave this as an explanation of his attitude, but on his cross-examination he was forced to admit that in the

past five years he had seen mother and son together only five or six times, and had to admit that his testimony on lack of control of the child was based on hearsay and finally added, "I don't know anything."

Nor is the finding that the child had no home until given one by Mrs. Carpenter supported by the preponderance of the evidence. The undisputed evidence is to the effect that he had been continuously with his mother except on five occasions. First, the six weeks or two months visit to the grandmother in 1942. Second, the stay with the maternal grandfather in 1945, when the mother was in the sanitorium. Third, the six weeks visit to the paternal grandmother in the summer of 1945. Fourth, the few weeks spent in the home of Mrs. Burkhart, and fifth, the short time spent in the home of Mrs. West. And the testimony shows that while the child was with Mrs. Burkhart and Mrs. West it was constantly visited by its mother, and it was also undisputed that at the end of each of these periods the mother reclaimed her child.

It may be said that the child should not have been placed with Mrs. Burkhart or Mrs. West, but in view of Mrs. Hunter's then financial condition, her distractions and her illness, it was the best she could do under the circumstances. However, since then both her physical and financial conditions have improved, and she now proposes to take the child to one of the two homes which she now owns, which is within three blocks of the school the child may attend.

Mrs. Hunter does not ask for the child because of the $67 per month allotment which the government pays Mrs. Carpenter, but because it was born to her and the hope of having it at last as her very own has been the inspiration leading to the recovery of her health, and her own health should be taken into account. If the child is taken from her she may again have psychosis, as the loss of a child under the circumstances here stated might cause psychosis in a mother who had never been so afflicted.

`I think the decree should be reversed and the child restored to the custody of its mother for the reason stated in the summation of the case in the brief of her counsel as follows:

"Instead of shifting the little fellow about, this mother, through trial and disappointment, with no personal, and little financial, help on the part of the father was doing her very best to maintain a home for him. For some five years without hope of reward, but following blindly the mother instinct, she clothed and fed him, provided a roof over his head, nursed him and trained him. The father admits that he left the care of this child to her. His interest in the matter must have been very slight for he admits that during this time he didn't 'know how she got along taking care of the child.' And the grandmother didn't know where mother or child was. Neither the father nor grandmother was greatly interested then, but fortunately the mother was. She was providing a home for the boy, and giving him her personal care and attention. But for her effort doubtless there would have been no little boy for the father and grandmother to claim now."

I am authorized to say that Justices HOLT and MILLWEE are of the opinion that the custody of this child should be awarded to its mother.